BRIDGES, J.,
for the Court:
¶1. M & S Petroleum, Inc. (M & S) seeks judicial review of the order of the Mississippi Commission on Environmental Quality (Commission) requiring M & S (1) to comply with the terms and conditions of Ex Parte Order No. 3226-96, as modified to allow on-site treatment of the wastewa-ter if such treatment is conducted in accordance with all applicable federal and state laws and regulations and with the prior approval of the Mississippi Department of Environmental Quality (MDEQ); (2) to retain an environmental consultant to perform a site remedial investigation in order to determine the extent of contamination of soil and groundwater at the Barrett Refinery in Vicksburg; (3) to perform site remediation for any media contamination that violates any state or federal standards, regulations, and/or laws, state clean-up standards or state or federal applicable or relevant and appropriate requirements; and (4) to pay penalties totaling $500,000, $250,000 of which is to be held in abeyance pending the completion of the requirements of the Commission’s order. The $500,000 penalty assessed by the Commission was levied against M & S for operating the Barrett Refinery in violation of the Clean Air Act, 42 U.S.C. §§ 7401 through 7492; the Clean Water Act, 33 U.S.C. §§ 1251 through 1387; the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901 through 6992k; Mississippi Air and Water Pollution Control Law, Miss.Code Ann. §§ 49-17-1 through 49-17-45 (Supp.1998); the Mississippi Solid Waste Disposal Law, Miss.Code Ann. §§ 17-17-1 through 17-17-65 (Supp. 1998); regulations promulgated pursuant to such laws, and federal regulations including National Emission Standards for Hazardous Air Pollutants (NESHAPS), New Source Performance Standards (NSPS) and the Mississippi Hazardous Waste Management Regulations.
¶ 2. M & S argues on appeal that as a subcontractor of Barrett Refining Corporation, the owner-permittee of the refinery, M & S was not liable for permit violations; that the assessed penalty is arbitrary and capricious; and that the ex-cessiveness of the fine assessed against M & S constitutes a denial of due process and equal protection. We affirm.
FACTS AND PROCEDURAL HISTORY
¶ 3. On March 14, 1991, Petro Source Resources sold its crude oil refining facility located on Highway 61 South on the Mississippi River in Vicksburg to Barrett Refining Corporation, an Oklahoma corporation incorporated in 1985. Pursuant to 40 C.F.R. § 122.61, Barrett Refining notified the MDEQ of the transfer in ownership and Barrett Refining’s assumption of permit responsibility, coverage and liability for the refinery.
¶ 4. The National Pollutant Discharge Elimination System (NPDES) Permit No. MS0035149 issued to Petro Source Resources allowing it to discharge wastewa-ter from the facility into the City of Vicksburg sewer line thence into the Mississippi River was modified to show the change in ownership to Barrett Refining Corporation. The permit was scheduled to expire on August 27, 1995. Part I of the permit set forth certain effluent limitations and monitoring requirements from process water and stormwater runoff at the refinery. No discharge of floating solids or visible foam in other than trace amounts were allowed under the permit nor could the *1107 discharge cause the occurrence of a visible sheen on the surface of the receiving waters.
¶ 5. On January 28, 1992, the MDEQ issued Air Pollution Control Permit No. 2780-00031 to Barrett Refining, which allowed the facility to operate air emissions equipment and emit air contaminants within certain emission limitations in order to produce jet kerosene, diesel fuel and unleaded gasoline. The operating permit was modified on July 13,1993.
¶ 6. Between 1991 and 1994, Barrett Refining Corporation operated the refinery producing various petroleum products including jet fuel under a contract with the United States Government. On July 12, 1994, Permit No. 2780-00031 was again modified and a construction permit was issued to allow the facility to produce navy diesel and JP8 kerosene, a form of jet fuel.
¶ 7. An inspection conducted on September 21, 1994, by the Air Division staff of the MDEQ, and staff from the United States Environmental Protection Agency (EPA) revealed a new 4.75 mmbtuh heater, three fixed roof storage tanks (Tanks 10, 11 and 12 with 10,000, 20,000 and 50,-000 barrel capacities, respectively), and a new preflash tower had been constructed without Barrett Refining obtaining the necessary construction permits as required by state regulation APC-S-2 and began operation in March 1994. In addition, crude oil rather than kerosene was stored in Tank 4; naphtha, not jet fuel, was stored in Tank 7; and the contents of Tank A was water, not kerosene as permitted.
¶ 8. On November 30, 1994, due to the loss of the government contract, Barrett Refining temporarily shut down its Vicksburg refinery. On December 13, 1994, an inspection of the facility by MDEQ staff confirmed the facility was not operating.
¶ 9. On January 5, 1995, Barrett Refining Corporation submitted to the MDEQ a modification application to reflect the permitted refinery expansion as built to cure the discrepancies found during the September inspection. The MDEQ received the application on January 18, 1995; however, the application was inadequate as submitted (original signature absent and calculation of prevention of significant deterioration applicability determination incorrect). Barrett Refining was notified of the inadequacy of the application by the MDEQ. No response was received curing the deficiencies and the MDEQ was unable to consider Barrett Refining’s modification application as submitted.
¶ 10. On April 17, 1995, Barrett Refining Corporation entered into a refining agreement with M & S Petroleum, Inc., a Texas petroleum brokerage company incorporated in 1994 by Eric Spickelmier, Jerry La-Barba, James LaBarba, John Cooke and Donald Mullins. Each principal owned a twenty percent interest in M & S. Mullins served as chairman of the board of directors of M & S. Mullins described the Barrett Refining/M & S agreement as a “through-put” agreement: M & S would buy feedstock for Barrett Refining to process at Barrett Refining’s Vicksburg refinery according to M & S’s specifications for a per barrel processing fee. M & S would sell the finished product.
¶ 11. Under the refining agreement, M & S was required to give Barrett Refining a monthly refining notiee describing the amount of feedstock to be provided for refining, the type of feedstock, and the estimated delivery date, and specifying the type of products to be refined. Feedstock was defined as “crude oil, blendstocks and other feedstocks owned or controlled by M & S at the Refinery or the Storage Facilities.” Moreover, M & S was to provide to Barrett Refining data regarding the quality of feedstock and a sample of any feedstock to be refined by Barrett Refining a minimum of seven days prior to the anticipated delivery date. Barrett Refining retained the “right to reject and refuse delivery of any Feedstocks which, in Barrett’s sole discretion, may not be suitable for refining or may contain contaminants *1108 which are harmful to machinery or personnel or which Barrett may deem an environmental hazard beyond normal considerations applicable to the straight distillation refining process.”
¶ 12. Barrett Refining Corporation retained control over the operations at the Vicksburg refinery under Item 18 of the agreement:
(c) Barrett Operations. Except as otherwise provided in this Refining Agreement, Barrett and M & S agree and acknowledge that M & S has no right whatsoever pursuant to the Refining Agreement, or otherwise, to direct, control or otherwise affect Barrett’s management and operation of the Refinery, Storage Facilities or any procedures or methodology utilized by Barrett in the Refining of Feedstock or other feedstock in or about the Refinery.
¶ 13. The required seven-day period for receiving samples of feedstock prior to unloading was waived by Barrett Refining on a one-time basis by letter agreement of the parties on April 27 to permit M & S to give Barrett Refining samples of the feedstock one day prior to unloading the “10,-000 barrel barge of ‘transmix’ (naptha, diesel, kero pipeline interface) now on the river in Vicksburg.”
¶ 14. On April 28, 1995, a compliance evaluation inspection at the refinery (EPA ID No. MSD982770869) conducted by the RCRA Compliance Section of the EPA revealed no RCRA violations. The inspector noted:
Wastewaters generated within the facility’s process area, including the desalters and other equipment, are all hardpiped to an API separator prior to being hard-piped to a public sewer discharge point. At the time of the inspection, Barrect (sic) was not storing or accumulating any hazardous wastes.
¶ 15. Following the execution of the refining agreement, Mullins relocated to Vicksburg to ensure that the finished product met the specifications required by M & S and that M & S feedstock did not disappear. Mullins was present at the refinery a minimum of eight hours a day, five days a week. The refinery manager was Larry Oakes, a Barrett Refining employee. According to Mullins, “M & S had no control over the process procedures or safety of the plant.” Mullins would instruct Barrett Refining employees how to run the M & S-owned feedstock to meet product specifications.
. ¶ 16. On April 28,1995, John Cooke of M & S contacted Brad E. Kulesza, Senior Technical Service Engineer with DuPont Specialty Chemicals, to schedule an inspection of the refinery in anticipation of purchasing heavy aromatic distillate (HAD) from DuPont. Kulesza forwarded summary information on the benzene OSHA standard, 29 C.F.R. § 1910.1028, for Cooke’s review prior to Kulesza’s visit to the refinery on May 3,1995. Mullins testified he received and reviewed a copy of Kulesza’s letter with the enclosure.
¶ 17. While visiting the refinery on May 3, Kulesza discussed the safe handling of HAD with Mullins, Oakes, and Geoffrey Couper, an independent consultant engineer hired by M & S to write procedures and train employees. Kulesza stressed in a May 5 letter to Mullins that “Benzene, a listed carcinogen, in the HAD makes this feedstock more hazardous than the normal feeds that Barrett Refining has been processing,” and delineated action items DuPont required M & S complete before HAD could be delivered to M & S. Mullins testified that he did not inform Kulesza the safe handling of HAD was the responsibility of Barrett Refining as owner of the facility rather than M & S as purchaser of the DuPont product.
¶ 18. Mullins testified that a copy of the letter was forwarded to John Barrett, Jr., president of Barrett Refining Corporation, because “[i]t was [Barrett Refining’s] responsibility to conform to the safety of the refinery and operations of the plant.” Mullins knew Mississippi had permit re *1109 quirements for refinery operations. Mullins opined that M & S had no responsibility to obtain a permit. Mullins did not know if the OSHA requirements of exposure limits (one part per million per eight-hour time weighted average) were followed because “it wasn’t his responsibility to monitor the exposure.”
¶ 19. Barrett denies receiving a copy of Kulesza’s letter or notice that M & S was contemplating purchasing or had purchased HAD for refining at the Vicksburg refinery. Barrett testified he first learned of Kulesza’s letter describing the steps required before DuPont HAD could be run at the Vicksburg refinery on October 12, 1995, when Edward Taylor, an OSHA inspector in Mississippi, contacted Barrett. According to Barrett, M & S agreed that the feedstock furnished to Barrett Refining for processing would be pipeline “tran-smix” and that M & S would not purchase any feedstocks which would be hazardous or which would present any unreasonable risk or result in violation of Barrett Refining’s permits. The material safety data sheets (MSDSs) supplied to Barrett Refining in May 1995 by Mullins indicated that the feedstock to be run was “fuel oil.”
¶ 20. To comply with DuPont’s requirements, Couper developed operating and safety procedures which included the material safety data sheet for DuPont HAD, plant startup procedures for DuPont HAD, and benzene OSHA standard, 29 C.F.R. § 1910.1028. Employees at the refinery were instructed to sign a form acknowledging they understood the procedures as implemented on May 18, 1995.[1] Mullins testified benzene awareness training classes for refinery operators and mechanics were conducted in May, June and July 1995. Mullins hired Terry Nevels in July to assist Mullins in obtaining the desired finished product from the feedstock.
¶ 21. On October 2, 1995, employees of Barrett Refining Corporation walked off the site. To protect its investment in the product on site and on order, M & S Petroleum assumed responsibility for the refinery operations on October 3 through an oral agreement with John Barrett. At that time, Barrett Refining employees became M & S employees and the operations and the safety of the plant became the responsibility of M & S. Mullins asserts he did not know why the employees left. In Mullins’s opinion, the plant was a safe work place from May 18 through October 2. To the best of his knowledge, the plant conformed to all federal and state requirements.
¶ 22. Mullins testified that approximately 36,000 barrels of DuPont HAD was processed at the refinery between May 18 and October 7, 1995. During the months of June, July and August, 20,000 barrels of DuPont HAD were distilled. Single cartridge respirators were available to employees at the Barrett refinery prior to the installation of a Drager tube air monitoring system in September 1995. Mullins did not know whether the employees used the single cartridge respirators.
¶ 23. To ensure M & S’s compliance with DuPont’s requirements for safe handling of HAD, Kulesza visited with Gary Adams and Kevin Boughan at the refinery on October 20, 1995. Kulesza notified Mullins of his findings during his visit by letter dated October 31, 1995. Kulesza found M & S had provided Benzene awareness training for operators/mechanics, developed procedures for unloading and processing HAD, provided safety shower and eye wash facilities at the barge unloading area, and posted benzene warning signs. As to Dupont’s recommendation that benzene exposure be monitored for eight hour and short term (fifteen minute) periods, Kulesza wrote:
You have completed some benzene 8-hour exposure monitoring and are await *1110 ing results. I know you have also measured benzene concentrations using a Draeger tube. I gave Kevin a copy of DuPont’s compliance guidelines for the OSHA benzene standard. In the guidelines, recommendations are given for the number of 8-hour exposure samples (using passive organic vapor monitors) and for 15-minute short-term exposures (STEL, per the OSHA standard, the 15-minute average exposure limit is 5 ppm). If your Draeger tube samples for potentially high exposure jobs (breaking HAD lines, sampling, etc.) are more than 5 ppm. Then 15-minute short-term exposure monitoring must be completed using charcoal tubes and a calibrated air pump. More guidance is provided in the guidelines I have given Kevin. You should be sure to take your 8-hour exposure monitoring when the unit is processing HAD. You should document all of the results of the benzene exposure monitoring program and notify employees of the results.
¶ 24. Kulesza also informed Mullins that HAD vapor pressure data had been provided to URS Consulting in Baton Rouge for it “to evaluate your permitting” and recommended “that [Mullins] make sure that your permitting includes benzene, which is a regulated hazardous air pollutant under Section 112 of the Clean Air Act.” John Barrett, Jr. testified he did not receive a copy of Kulesza’s October 31, 1995 letter to Mullins.
¶ 25. M & S contracted with Saybolt, Inc. to analyze samples pulled periodically by M & S. The following benzene concentrations were found by Saybolt:
Date Sample Pulled Source of Sample Analysis Result
August 15,1995 Tank 10 37.7%
August 21, 1995 Tank 3 22.2%
August 21, 1995 Tank 10 24.03%
August 24,1995 Tank 10 18.55%/12.64%
August 30,1995 Tank 10 15.78%
August 30,1995 Tank 2 16.68%
September 6, 1995 Tank 7 19.93%
September 8, 1995 Tank 6 5.40%
September 8, 1995 Tank 8 36.70%
October 3,1995 Tank 3 40.81%
October 1995 [2] Tank 7 17.2%
¶ 26. On September 29,1995, in response to an anonymous complaint the day before, MDEQ personnel contacted Larry Oaks, who was identified as the Barrett Refining Corporation on-site plant manager, and Terry Nevels, who was identified as the safety/quality control manager. MDEQ staff was informed Barrett Refining Corporation was leasing the facility to M & S Petroleum Company and that the facility was shutdown due to the benzene release from the refinery into the City of Vicksburg’s NPDES permitted publicly-owned treatment works. According to Nevels, more than lOppm benzene had been detected utilizing the Dragger Tube Method. Moreover, MDEQ staff was informed that the facility was refining a DuPont Heavy Aromatic Distillate (HAD) material, not the usual crude oil stock material.
¶ 27. In response to the inspection, Robert Elliott Bickerstaff, Environmental Engineer II, Office of Pollution Control, Air Division, called Donnie Mullins to discuss the current operating status of the facility. Mullins stated M & S had a leasing agreement with Barrett Refining, but that Barrett Refining continued to have operating control of the facility. Mullins further stated M & S was receiving a “crude oil product” called HAD that was separated into a gasoline blend stock and a diesel. The excess benzene was being removed and stored in one of the tanks for later sale. According to Mullins, DuPont had inspected the facility and determined the facility was sufficient for the processing of the HAD material and that Barrett Refining had assured M & S the facility had the necessary permits and was capable of processing the HAD material. Bickerstaff testified Mullins was advised that the air permit did not allow the facility to operate in the manner described and a construction permit was necessary to make the changes to allow the facility to process *1111 HAD material. Bickerstaff farther advised Mullins that several federal regulations applicable to certain air emissions could be applicable to the processing of the HAD material and these standards may-have been violated. Mullins responded that the facility would not operate for at least one week and no HAD material was in stock. Mullins further stated that no HAD material would be processed at the refinery until the permits were in order. A current process description of the facility for MDEQ evaluation was promised by Mullins. However, no such process description was received by MDEQ.
¶ 28. Shortly thereafter, John Barrett, Jr. called Bickerstaff seeking reinstatement of permits. Bickerstaff explained that the current air operating permit had not expired but that the September 29 inspection showed the facility was operating in a manner not allowed by Barrett Refining’s air permit and in violation of federal NSPS and NESHAPS. Further, Bickerstaff told Barrett that construction permits and operating permit modifications were necessary for the change in the process. Barrett expressed his belief that the air permit allowed the current process, but that the facility would not be operated until he made sure the facility was in compliance with its permit.
¶29. Thereafter, numerous complaints of excessive odors emanating from the refinery were received by the MDEQ. The MDEQ responded to these complaints by sending staff from the Air, Water and Hazardous Waste Divisions of the Office of Pollution Control to inspect the refinery.
¶ 30. On October 3, 1995, MDEQ staff members Richard Harrell and George Malvaney visited the Barrett Refinery to investigate the allegation of benzene spillage. Mullins denied access to the MDEQ staff for sampling purposes. Due to the reported benzene releases from the facility, combined with strong petroleum-related odors emanating from the facility during a reported shutdown and denial of access to the refinery, Hazclean Environmental Consultants, Inc. was hired by MDEQ to conduct air sampling for aromatic hydrocarbons. Costs relating to the air sampling activities totaled $23,461.53.
¶ 31. The Occupational Safety and Health Administration (OSHA) inspected the facility on October 5, 1995, and gathered samples of tank contents from Tanks 2 through 6 for analysis of benzene. The reports from the samples gathered by OSHA revealed benzene levels in the tanks as follows: Tank 2 — 16%; Tank 3 — 39.2%; Tank 4 — 4.6%; Tank 5 — .23%; Tank 6— 6.9%.
¶ 32. On October 12, 1995, Bickerstaff, Jerry Beasley and Anthony Robinson inspected the refinery in response to odor complaints. The inspection revealed that the facility was operating. According to Mullins, the facility was refining a feedstock of six oil to produce a gasoline blend stock and marine diesel, the refinery was not processing the HAD material, the HAD material was stored in Tank 4, the light gasoline blend was stored in Tank 3, and a solvent blend was stored in Tank 5. Mullins further stated that the HAD material received at the facility was 12% benzene and had been mixed to less than 10% benzene. Mullins asserted a high benzene content product was not being produced.
¶ 33. A review of the MDEQ’s records on Barrett Refining indicated that the process, as described by Mullins on October 12, was permitted pursuant to the operating permit issued to Barrett Refining Corporation in 1991. MDEQ staff noted no discharge monitoring report was submitted from the facility for the months of January 1995 through September 1995, and Barrett Refining, the permittee, had not submitted a permit application for reissuance of NPDES Permit No. MS00351349 although the permit had expired on August 27, 1995.
¶ 34. On November 3, 1995, Robinson inspected the facility in response to odor complaints, and was told by Mullins that the facility had commenced operation on November 1, processing only six oil. Rob *1112 inson obtained MSDSs on the feedstocks. Mullins indicated that feedstock was stored in Tank 4 and Tanks 3, 5, 6 and 7 were being used to store the products. No logs and vapor pressure records required under the air operating permit and by NSPS Subpart Ka and Subpart Kb were maintained by Mullins.
¶ 35. Based on this information and the fact that there was no previous incidence of odors from the refinery, the MDEQ determined that the refinery was being operated in a manner which caused excessive organic emissions in violation of the operating permit issued to Barrett Refining. In particular, MDEQ inspections revealed the petroleum liquids stored in Tanks 1, 3, 4, 5, 6, 7, and 8 were not those that were permitted and appeared to have higher vapor pressures and a higher concentration of aromatic hydrocarbons than the permitted contents. Unpermitted Tanks 11 and 12 were also in use at the time of the inspections. The inspections further revealed that monitoring and record keeping of the vapor pressures of the tank contents were not being performed as required by the facility’s operating permit and by NSPS Subpart Ka, 40 C.F.R. Part 60.115a, and Subpart Kb, 40 C.F.R. Part 60.116b.
¶ 36. By letter dated November 9, 1995, the MDEQ recommended that the facility cease operation immediately and that Barrett Refining Corporation contact the MDEQ to determine the operating parameters allowed under the current permit. The MDEQ forwarded a copy of the letter to Mullins.
¶ 37. On November 21, 1995, Harrell performed a compliance evaluation inspection at the Barrett refinery in response to a recent fire at the refinery and numerous odor complaints received by MDEQ. Accompanied by Mullins, Harrell performed a site walkover of the processing area, oil/water separator and tank farm area. The area around the product pre-heater, where the fire occurred, was heavily stained and oil/water sludge was present from fire extinguishing efforts. The internal pipes from the pre-heater unit had been removed and placed in the facility’s “boneyard” without any type of decontamination or cleaning procedures. Sludge remained in the pipes. The area below the processing area was heavily stained with petroleum material. Free product was observed in the ditch and in crevices in the concrete. In the tank farm, numerous valves showed signs of leakage and the soil beneath many valves was heavily stained.
¶ 38. On December 1, 1995, Bickerstaff and Dewayne Headrick inspected the refinery in response to complaints of very bad odors coming from the Barrett Refinery tank farm. Dale Adams told the inspectors that the refinery was not operating except for circulation of feedstock and transference of the contents of Tank 4 into Tank 6. According to Adams, feedstock was contained in Tanks 6 and 7. The MSDS provided by M & S as showing the feedstock in Tanks 6 and 7 was the same MSDS given to MDEQ personnel on November 3 as the MSDS for product.
¶ 39. Mullins was advised that the odor problem must be addressed by M & S. Mullins represented that the odors were associated with the feedstock and were not harmful. According to Mullins, the last shipment of any feedstock received by the facility was a six oil stock stored in Tank 10. Again, Mullins stated that no HAD material was being processed at the facility. When requested to produce the records required to be maintained by the permit and federal regulations, Mullins provided a gauge log dated November 2, 1995 which did not contain the required information. Bickerstaff advised Mullins that the manner in which the refinery was being operated was not in compliance with the operating permit and that continued operation would compound any resulting enforcement action.
¶ 40. On December 13, 1995, an inspection was conducted by Todd Smiley of EPA, Region IV, and MDEQ Air Division *1113 personnel. The facility was not operating at the time of the inspection. This inspection revealed Barrett Refinery had operated in violation of NSPS Subpart A and Kb, NESHAPS Subpart J, state permit regulation APC-S-1, and other potential violations which required further investigation.
¶ 41. On December 19, 1995, in response to odor complaints, Rose Mary Bagby, manager of the Wastewater Treatment Plant and Lab of the City of Vicksburg, inspected the manhole into which the Barrett facility’s wastewater outfall discharged. Bagby testified the Barrett facility outfall was discharging into the manhole creating a strong odor which irritated her eyes and respiratory tract. The discharge contained a dark brown material that would not mix with water. Bagby testified that the fluid had a sheen and was turbid. Analyses of samples of the wastewater discharged from the Barrett Refining facility showed 20.9 milligrams per liter of benzene from samples 1 and 2 and 23.7 milligrams per liter of benzene in samples 3 and 4. Subsequent inspections by Bagby on December 21, 1995, and January 4, 1996 revealed no discharge from the Barrett Refinery outfall point was being released into the manhole although vapors and odors were present.
¶42. MDEQ staff found the facility in operation on December 27, 1995. Mullins advised that the facility was processing six oil, and that the last barge of six oil had been stored in Tank 11 on December 18, 1995. According to Mullins, the last barge of HAD material containing between eight percent and ten percent benzene was received at the refinery at the end of October or first of November, 1995. Mullins further stated that the light end material resulting from the processing of the HAD material was stored in Tank 3 and was approximately 38% benzene. None of the processed material had been sold. Bicker-staff again explained to Mullins in detail the information required to be maintained in the records and logs in order to comply with federal regulations. Mullins provided a log maintained by M & S which revealed that the vapor pressures of the liquids stored in the tanks were higher than the permitted liquids for the tanks and that the vapor pressures were over the threshold values which subjected the tanks to the NSPS record keeping or control standards. Bickerstaff further advised Mullins that the continued odors indicated that there were leaks in the process and/or excess emissions from the tanks due to damaged tank seals. No leak detections results were provided to MDEQ despite Mullins assurance that tests would be performed to determine if there were any problems with the tanks or process equipment.
¶ 43. On January 5, 1996, the MDEQ notified Barrett Refining and M & S that penalties up to $25,000 per day per violation could be assessed statutorily by the Commission for the following violations of the Mississippi Air and Water Pollution Control Law, the regulations promulgated pursuant thereto, federal regulations and permits issued to this facility:
AIR DIVISION VIOLATIONS
Inspections of the referenced facility by staff on September 21, 1994, October 12, November 3, December 1, December 13, and December 27, 1995, revealed the following violations:
1. An inspection on September 21, 1994, revealed that Facility Storage Tanks 10, 11 and 12 were constructed and operating prior to receiving a permit to construct and operate as required by Mississippi Air Permit Regulations APC-S-2, Section l.B.1. '
2. The facility’s Operating Permit No. 2780-00031, Part III, Item 3 requires the maintenance of a log recording the tank contents, the Reid vapor pressure of each hydrocarbon liquid, the dates of storage and the dates the tanks are empty at the facility. In addition, Tanks 1-9 are subject to New Source Performance Standards (NSPS), Ka and Tanks 10, 11, 12, A, B and C are subject *1114 to NSPS, Subpart Kb. Sections 60.115a and 60.116b of these standards require the maintenance of records of the liquid stored, the period of storage and the maximum true vapor pressure during the storage period. Inspections on October 12, November 3, and December 1, 1995, revealed that these records were not being maintained and inspections on December 13 and 27, 1995, revealed that incomplete records were being maintained.
3. Facility Storage Tanks 1, 2, 3, 4, 6, 7 and 8 are permitted for the storage of diesel fuels and kerosenes. On October 12, 1995, and subsequent inspections, the tanks contained unpermitted petroleum liquids with higher vapor pressures than allowed by the permit.
4. NSPS, Subpart Kb, Section 112b requires that a storage vessel containing a volatile organic liquid with a maximum true vapor pressure of 5.2 kPa (.75 psia) be equipped with a floating roof or a vapor collection system. Tank 10 is a fixed roof storage tank and, based on information obtained during the December 27,1995, inspection, contains a liquid with a maximum true vapor pressure greater than 5.2 kPa in violation NSPS, Subpart Kb, Section 112b.
In addition, our investigation has revealed that the facility has been operated to refine a petroleum liquid containing up to 25% benzene to produce a product of at least 39% benzene which is stored in Tank 3. Operating the facility in this manner subjects the facility to the National" Emission Standards for Hazardous Air Pollutants (NESHAPS), Subpart J, Standards for Equipment Leaks of Benzene. Since there were no requests, notifications and/or demonstrations from the facility to this agency regarding this change in operation, additional violations include:
5. Violation of the NESHAP General Provisions, Section 61.07 for failure to submit an application for approval of modification of the facility required by the standard.
6. Violation of the NESHAP General Provisions, Section 61.09 and 61.10 and of Subpart J. Section 61.247 for failure to submit the initial notifications and reports required by the standard.
7. Violation of the NESHAP General Provisions, Section 61.13 and of Subpart J, Section 61.245 for failure to demonstrate compliance with the standards as listed in Sections 61.242-1 through 61.242-11.
8. Violation of the NESHAP General Provisions, Section 61.05 and Subpart J, Section 61.242-9 for operating Tanks 2 and 3 in benzene service without a closed vent vapor control system.
SURFACE WATER DIVISION VIOLATIONS
1. NPDES Permit No. MS0035149 expired on August 27, 1995. The referenced facility is apparently discharging wastewater in violation of the Mississippi Air and Water Pollution control Law (Mississippi Code Annotated Section 49-17-29) and the Federal Clean Water Act.
2. NPDES Permit No. MS0035149, Part I, C.2 — Discharge Monitoring Reports for the months of January, 1995, through September, 1995, have not been submitted to our office as required by the permit and state and federal regulations.
3. NPDES Permit No. MS0035149, Part I, C.5. — Records Retention — An inspection of the facility on October 12, 1995, revealed that records required by the permit and state and federal regulations were not maintained at this facility.
¶ 44. On January 23,1996, upon learning that the Barrett facility’s NPDES permit had expired, City of Vicksburg employees placed a cap on the Barrett discharge pipe and the manhole was filled with concrete to plug the former connection of the Barrett outfall line into the manhole. There *1115 after, M & S stored stormwater runoff and process water in Tank 9.
¶45. Barrett Refining filed for bankruptcy under 11 U.S.C: §§ 1101 through 1146 in the United States Bankruptcy Court for the Western District of Oklahoma on February 12,1996.
¶ 46. M & S ceased operations at the refinery on February 15,1996.
¶ 47. MDEQ retained Environmental Diagnostic Laboratories (EDL) to gather and analyze all tank contents and other materials at the facility on February 21 and 22, 1996. The analyses performed by EDL showed that the facility was storing large amounts of benzene contaminated wastewater and other materials not associated with normal crude oil refining.
¶ 48. In response to the results from the EDL sampling event, MDEQ staff from the Air, Surface Water and Hazardous Waste Divisions of the Office of Pollution Control visited the facility and observed violations of the Mississippi Hazardous Waste Management Regulations, including numerous drums containing contaminated media of unknown concentrations leaking, open to the environment, or not properly closed; pipes from the heat exchanger fire still in the boneyard area; a large sump at the south end of the facility containing storm water runoff which had a visible petroleum sheen on the surface; a portable pump in the sump which appeared to be connected directly to a creek outfall; free product was observed in holes in the concrete in the process area; numerous leaks/drips in the process area; in the tank farm, sludge was present under the storm water inside the earthen diked areas; valves on the tanks were leaking material onto the ground; dead and stressed vegetation in the tank farm area; several areas within the tank farm had been recently excavated and/or turned over; two large piles of excavated soil in the southwest corner of the facility which Mullins stated were from spills at the facility and had not been tested; several of the groundwater sampling wells and at least one of the groundwater recovery wells were under water from recent rains.
¶ 49. On February 29, 1996, Barrett Refining Corporation was notified that its application for a Title V Air Operating Permit submitted January 29, 1996, did not reflect operations observed during inspections at the refinery. MDEQ further advised Barrett Refining that the facility did not have an application shield for its current operations and that the facility was considered to be in operation as long as materials were stored in the tanks.
¶ 50. On March 7, 1996, under authority of Miss.Code Ann. § 49-2-13 (Rev.1990), the MDEQ executive director issued ex parte orders against M & S and Barrett Refining.[3] The executive director found
2.
[M & S] is storing and/or treating material (including, but not limited to, wastewaters, solid waste, feedstock, and product) in tanks, drums, oil/water separators, sumps, and pipelines (or other conduits used to transfer materials at the site) at a facility that [M & S] is operating located at Old Highway 61 South, Vicksburg, Mississippi, known as the “Barrett Refinery.” Thus far the investigations by Staff have determined that the wastewater stored in Tank 9 on the site is a hazardous waste as defined by the Mississippi Hazardous Waste Management Regulations and the heat exchanger bundle sludge on site (resulting from a fire) is a listed hazardous waste (K050).
3.
The above referenced inspections and investigations have further revealed that [M & S] does not have National Pollutant Discharge Elimination System (NPDES) and Mississippi Hazardous *1116 Waste Management permits for the facility. In addition, certain activities at the facility have been and are currently in violation of Air Emission Permit No. 2780-00031 including, but not limited to,' the storage of materials in tanks that are not covered by the permit.
4.
The inspections and investigations referenced in paragraph 2. have also revealed waste contained in a variety of containers, including pails, bags and absorbent materials, and waste material spilled onto the ground, which are not being handled in accordance with applicable state and federal regulations.
¶ 51. Based on these findings, the Commission determined that M & S “has operated and/or is operating the facility in violation of Mississippi Code Annotated Sections 49-17-29 and 17-17-27, Air Emission Permit No. 2780-00031, Part 402 of the Clean Water Act, 40 C.F.R. Part 419 and the Mississippi Hazardous Waste Management Regulations” and ordered M & S to
(1) immediately cease and desist any processing operations until such time as all applicable permits are obtained from the Mississippi Environmental Quality Permit Board;
(2) immediately cease receiving any shipments of any additional materials on site;
(3) immediately containerize in drums, handle and label in accordance with applicable laws and regulations all waste materials currently stored in vats, bags, pails, drums, or other methods and other waste materials such as absorbent pads which are on site;
(4) within thirty days of the date of the order, handle and remove to authorized off site locations (in accordance with applicable laws and regulations) all materials (including raw products, intermediate products, final products, waste-water and solid wastes) stored in any holding structures including, but not limited to, (a) all liquids in tanks; (b) all waste materials including, but not limited to, soils, sludges, rags, and liquid wastes, in drums; (c) all liquids, solids, and sludges in oil/water separators, sumps, and pits; (d) all contaminated soil stored in the southwest corner of the site resulting from the attempted cleanup of a spill; (e) all other waste material contained in vats, pails, bags, or absorbent materials; and (f) all materials contained in pipelines, flowlines, hoses and/or any other conduits used to transfer materials to and from tanks in the tank farm area;
(5) within 15 days after all material is removed to off site locations, submit, in writing, to the MDEQ, the contents and volume of material removed from each holding structure or location, the date the material was removed, where M & S originally obtained the material, the off site location where the material was taken (including the name, address, telephone number and uses of the material), and any manifests, invoices, or other documents evidencing the shipment of the material; and
(6) within 30 days after the date of the order, submit a plan (prepared, signed and sealed by a registered professional engineer) to the MDEQ for approval which describes procedures to achieve the following within 90 days after approval of the plan: (a) decontamination of all tanks; (b) decontamination of all oil/water separators, concrete pads in process area, pits, and sumps; and (c) purging and decontamination of all pipelines, flowlines, hoses, and any other conduits used to transfer material in the tank farm area.
¶ 52. The March 7 ex parte order did not address fines, penalties, other sanctions, further removal and/or remedial actions and/or future violations of environmental laws, rules and regulations.
¶ 53. On March 13, 1996, MDEQ was advised that M & S had “removed all *1117 product and feedstocks from the Barrett Refinery tanks in Vicksburg.” However, a subsequent MDEQ inspection of the facility revealed that a significant area around the oil/water separator had been contaminated with a K051 listed waste as a result of the flooding of the oil/water separator, and “[tjhere were several other tanks, sumps, etc. on site, including Tank 9 (which contains 1.5 million gallons of hazardous wastewater) the status of which MDEQ had not been advised. The product and/or hazardous wastes contained in these tanks, sumps, etc. and wastes on site must be removed and/or disposed in accordance with all federal and state law regulations by April 6 in accordance with [Order No. 3226-96].”
¶ 54. An inspection conducted on April 2, 1996, showed that “very little action” had been taken by Barrett Refining and/or M & S to comply with the ex parte orders. On August 15,1996, MDEQ staff inspected the facility in response to an odor complaint and determined that the odor was caused by cleanup activities.
¶ 55. M & S vacated the facility on August 31,1996.
¶ 56. On November 6, 1996, the MDEQ served separate written complaints on Barrett Refining and M & S. Barrett Refining and M & S petitioned the Commission for a full evidentiary hearing on the ex parte orders and complaints. At the request of the parties, direct evidence, including testimony and exhibits, was pre-filed with the Commission on January 17, 1997, and rebuttal evidence was pre-filed by January 31, 1997. At the consolidated evidentiary hearing on April 24, 1997, the Commission heard from witnesses called adversely for cross-examination or for redirect testimony. At the conclusion of the hearing, the Commission requested the parties submit post-hearing briefs on May 12,1997.
¶ 57. On May 22, 1997, after discussion, the Commission voted[4] to accept the MDEQ staff recommendation as to the testing and remediation activities that should be taken on the refinery site, to assess penalties against Barrett for a total of $750,000 (which was $49,366 less than the penalties recommended by MDEQ staff), with $250,000 of that held in abeyance pending completion of the remediation and with the cost spent by Barrett on testing and remediation acting as credit against the $250,000,[5] and to assess penalties against M & S for $500,000, with $250,000 of that held in abeyance under the same terms (M & S getting credit up to $250,000 for money spent on testing and remediation).
¶ 58. On July 24, 1997, the Commission “adopted and accepted the evidence presented in the written and verbal testimony of MDEQ staff’ and issued its order finding Barrett Refining Corporation violated “the Clean Air Act (42 U.S.C. Section 7401 et seq.), the Clean Water Act (33 U.S.C. Section 1251 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), the Mississippi Air and Water Pollution Control Law (Mississippi Code Annotated Sections 49-17-01, et seq.), the Mississippi Solid Waste Disposal Law (Mississippi Code Annotated Sections 17-17-1, et seq.), regulations promulgated pursuant to such laws, Air Per *1118 mit No. 2780-00031, National Pollutant Discharge Elimination System (NPDES) Permit No. MS0035149 and federal regulations including National Emission Standards for Hazardous Air Pollutants (NESHAPS), New Source Performance Standards (NSPS) and Mississippi Hazardous Waste Regulations.” The Commission assessed penalties against Barrett Refining totaling $750,000 and ordered that $250,000 of the assessed penalty be held in abeyance pending completion of the requirements of the order. Further, any sums expended by Barrett Refining on MDEQ-approved remediation and testing would be credited against the $250,000 held in abeyance.
¶ 59. In a separate order dated July 24, 1997, the Commission found “from the substantial evidence presented at the hearing that M & S operated the Facility from at least October 3, 1995 to at least January 30, 1996” and violated “[the Clean Air Act (42 U.S.C. Section 7401 et seq.), the Clean Water Act (33 U.S.C. Section 1251 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), the Mississippi Air and Water Pollution Control Law (Mississippi Code Annotated Sections 49-17-01, et seq.), the Mississippi Solid Waste Disposal Law (Mississippi Code Annotated Sections 17-17-1, et seq.), regulations promulgated pursuant to such laws, and federal regulations including National Emission Standards for Hazardous Air Pollutants (NESHAPS), and New Source Performance Standards (NSPS) and Mississippi Hazardous Waste Regulations]” in the following manner:
AIR VIOLATIONS
1.Violation of APC-S-2 Section I.B.1 and NESHAPS General Provisions, 40 C.F.R. 61.05 and 61.07 for operating the facility without applying for and obtaining a construction permit for changes in operation that resulted in increased emissions subjecting the facility to NESHAP Subpart J— Equipment Leaks for Benzene.
2. Violation of NSPS Subpart Ka, 40 C.F.R. 60.115a, and NSPS Subpart Kb, 40 C.F.R. 60.116b for failing to keep records of tank contents by these provisions for fourteen tanks (Tanks 1-11, A, B, and C).
3. Violation of NSPS Subpart Ka, 40 C.F.R. 60.112a(a)(2) for failing to properly operate and maintain the floating roofs for tanks 1, 2, 3, and 9 in accordance with these standards.
4. Violation of NSPS Subpart Kb, 40 C.F.R. 60.112b(a) for failing to properly equip and operate tank 10 with a vapor control device.
5. Violation of NSPS Subpart Ka, 40 C.F.R. 60.113a(l) for failing to test tank 4 in accordance with this standard.
6. Violation of NESHAP Subpart A and V, 40 C.F.R. 61.09 and 247 for failing to submit notifications and reports required by these standards.
7. Violation of NESHAP Subpart A and V, 40 C.F.R. 61.05(b), 13 and 245 for failing to perform testing required by these standards.
8. Violation of State of Mississippi Air Emission Operating Permit Requirements for the Purpose of Title V of the Federal Clean Air (APC-S-6) by failing to obtain a Title V Operating Permit by January 27,1996.
HAZARDOUS WASTE VIOLATIONS
1. Violation of Mississippi Hazardous Waste Management Regulations (MHWMR) 262.11 by generating a solid waste as defined in 40 C.F.R. Part 261.2 and failing to determine if that waste is a hazardous waste using an approved method. Samples gathered and analyzed by Environmental Diagnostic Laboratory on February 21-22, 1996 revealed that [M & S Petroleum, Inc.] was storing approximately 1.5 million gallons of benzene contaminated waste water in Tank 9. In addition, inspections *1119 by [DEQ] staff revealed that sludges in the oil/water separator and the heat exchanger bundle sludge on site (resulting from a fire) are a listed hazardous waste (K050).
2. [M & S Petroleum, Inc.] has stored the hazardous waste specified in item 1 for over 90 days without obtaining a permit which is a violation of 40 C.F.R. part 270.1(c) (MHWMR 270.1(c)).
SURFACE WATER VIOLATIONS
1. National Pollutant Discharge Elimination System (NPDES) Permit No. MS0035149 expired on August 27, 1995. [M & S Petroleum, Inc.] apparently discharged wastewater without a permit in violation of the Mississippi Air and Water Pollution Control Law Section 49-17-29 and Section 402 of the Federal Clean Water Act after August 27, 1995.
¶ 60. The Commission assessed total penalties to M & S in the amount of $500,000 ($39,366 less than MDEQ recommended), and ordered $250,000 of the assessed penalty be held in abeyance pending completion of the requirements of the order. Further, any sums spent by M & S on remediation and testing approved by MDEQ would be credited against the $250,000 held in abeyance. The Commission also ordered M & S (1) to comply with the terms and conditions of Ex Parte Order No. 3226-96, as modified to allow on-site treatment of the wastewater if such treatment is conducted in accordance with all applicable federal and state laws and regulations and with the prior approval of the Mississippi Department of Environmental Quality (MDEQ); (2) to retain an environmental consultant to perform a site remedial investigation in order to determine the extent of contamination of soil and groundwater at the Barrett Refinery in Vicksburg; and (3) to perform site remediation for any media contamination that violates any state or federal standards, regulations, and/or laws, State clean-up standards or state or federal applicable or relevant and appropriate requirements.
¶ 61. Barrett Refining and M & S appealed the orders of the Commission to the Chancery Court of Hinds County. The chancellor affirmed the Commission’s orders. Aggrieved, Barrett Refining and M & S filed this appeal.
¶ 62. On February 16,1999, a settlement was reached regarding the Commission’s enforcement case against Barrett Refining. An order dismissing the appeal, with prejudice, as to Barrett Refining was entered by this Court on April 19, 1999.
¶ 63. On April 2, 1999, this Court was advised that Donald Mullins and M & S Petroleum, Inc. entered pleas of guilty to Counts 9 and 1 in United States of America v. Donald A. Mullins, No. 5:98 cr 15 BrN (S.D.Miss.), relating to false statements made to MDEQ officials regarding violations at the refinery, including violations of the Clean Air Act, the Clean Water Act and the Resource Conservation and Recovery Act.
ARGUMENT AND DISCUSSION OF LAW
¶ 64. The scope of review in this case is limited since this Court is reviewing the decision of an administrative agency. An appellate court must uphold the agency’s decision unless it finds that “the decision of the administrative agency was unsupported by substantial evidence, was arbitrary or capricious, was beyond the power of administrative agency to make, or violated some statutory or constitutional right of the complaining party.” Miss. Comm’n on Envtl. Quality v. Chickasaw County Bd. of Supervisors, 621 So.2d 1211, 1215 (Miss.1993). A rebuttable presumption exists in favor of agency decisions, and an appellate court may not substitute its judgment for that of an agency. Id. at 1216. Finally, the scope of appellate review is limited to the administrative record and the findings of the agency. Bd. of *1120 Law Enforcement Officers Standards & Training v. Butler, 672 So.2d 1196, 1199 (Miss.1996).
I. WHETHER M & S COULD BE HELD LIABLE FOR VIOLATIONS AT THE BARRETT REFINERY.
¶ 65. M & S does not dispute the violations charged in this case occurred. M & S asserts Barrett Refining, the per-mittee and owner of the refinery, was fully responsible for compliance with the permit requirements at the Vicksburg facility, and that by penalizing M & S the Commission expanded the permit compliance obligation to reach parties other than the permittee.[6] The Commission argues that M & S is not shielded from liability merely because it held no permit. An owner/permit holder and an operator of a facility may be cited for violations when appropriate.
¶ 66. The amount of control a company has over the operations of a facility is determinative of whether the company may be held liable as an operator. See Edward Hines Lumber Co. v. Vulcan Materials Co., 861 F.2d 155, 157 (7th Cir. 1988). Here, M & S admitted operating the refinery, hiring the employees, taking responsibility for safety, buying and controlling the feedstocks and products, directing how the feedstocks should be refined, and paying all utilities.
¶ 67. M & S, through Mullins, acknowledged it assumed responsibility for operating the facility on October 3, 1995 through an oral agreement between the parties after Barrett Refining employees walked off the job site. M & S hired persons to replace the Barrett Refining employees and the operations and safety of the facility became M & S’s responsibility. M & S continued to operate the refinery until at least January 30,1996.
¶ 68. In addition to the admissions by M & S that it was operating the plant with M & S employees, relevant laws and regulations make clear that an operator such as M & S may be held liable for violations. The Federal Clean Air Act Regulation, 40 C.F.R. § 61.03 (1998), provides that “owner or operator means any person who owns, leases, operates, controls, or supervises a stationary source.” “[Olperator means the person responsible for the overall operation of a facility,” according to the Federal Resource Conservation and Recovery Act Regulation, 40 C.F.R. § 260.10 (1998). The Federal Clean Water Act Regulation, 40 C.F.R. § 122.2 (1998), provides that “owner or operator means the owner or operator of any ‘facility or activity’ subject to regulation under the NPDES permit program.”
¶ 69. M & S relies on Miss. Dep’t of Envtl. Quality v. Weems, 653 So.2d 266 (Miss.1995), in which excerpts were quoted from letters written by the MDEQ executive director in response to a request for legal guidance from the owner/permittee regarding whether a contractor was required to obtain a separate or additional permit to provide certain daily solid waste management services under an 'operating agreement with a permitted owner. The executive director wrote:
For regulatory purposes, the holder of a permit is deemed to be the operator of the facility for all purposes.... All per *1121 mitting and enforcement actions which may arise by virtue of operation of such facilities will be directed exclusively at the permittee/operator who will, at all times, be responsible for compliance with conditions of the permit.
Id. at 269. The lower court in Weems correctly noted that “[t]he Commission ‘does not speak, nor set policy, through the letters of its Executive Director. It can only speak through its own official action.’ ” Id. at 272. Remanding the case to the Commission, the Mississippi Supreme Court directed the Commission to review whether an operator, in addition to the permittee, could be held responsible for violations at the subject facility. On remand, the Commission initiated an enforcement action against the owner/permit-tee and the operator of the landfill.
¶ 70. The Commission’s determination that an enforcement action may be brought against an owner, permit holder and/or operator of a facility is in accord with Miss.Code Ann. § 49-17-29 (Rev. 1990), which provides that any person who causes pollution of the air or waters of the state or places or causes to be placed any wastes or other products or substances in a location where they are likely to cause pollution or discharges substances into the air or water that exceed any applicable federal or state standards has violated state law.
¶ 71. We find the Commission’s order holding M & S liable for operating the refinery from October 3, 1995, through January 80, 1996, in violation of the environmental laws, rules and regulations and without the necessary permits to be supported by substantial evidence, not arbitrary and capricious, within the scope of the power of the administrative agency to make, and not violative of any statutory or constitutional right of M & S. Accordingly, this assignment of error is without merit.
II. WHETHER THE COMMISSION’S ASSESSMENT OF $500,000 IN FINES AGAINST M & S WAS ARBITRARY AND CAPRICIOUS.
¶ 72. M & S next argues the Commission’s order is arbitrary and capricious inasmuch as no findings of fact and conclusions of law were set out in the order to support the imposition of $500,000 in penalties. The Commission asserts the order expressly adopted and accepted the evidence presented in the written and verbal testimony of MDEQ staff as the basis for its finding of liability and for the assessment of the penalty. In addition, the order specifically listed and discussed the seven factors the Commission is required by law to consider in the calculation in any penalty.[7]
*1122 ¶ 73. The standard of review to be applied by this Court in reviewing a penalty assessed by the Commission is the same as that employed when reviewing other agency findings and actions. Chickasaw County, 621 So.2d at 1215. This Court will reverse the Commission’s imposition of penalties only if the decision is not supported by substantial evidence, is arbitrary or capricious, is beyond the power of the Commission to make, or violates some statutory or constitutional right of M & S.
¶ 74. Following the evidentiary hearing on April 27, 1997, concern was expressed by the Commission regarding the size of the fines recommended by MDEQ staff. Post-hearing briefs were requested to address the Commission’s questions regarding the precedent existing for the penalties recommended by MDEQ, how the penalties were calculated, the procedures outlined in the penalty guidance documents for calculating penalties, the compliance history of M & S, tests or other actions taken by MDEQ at the Barrett facility, and the authority existing for charging M & S with violations. These briefs were filed with the Commission on May 12, 1997.
¶ 75. On May 22, 1997, after considering the post-hearing briefs submitted by the parties, three commissioners approved the order, one voted no, and two abstained. Due to the split vote of the commissioners, M & S asserts specific findings to support the Commission’s imposition of the penalties was critical for appellate review. As the Mississippi Supreme Court stated in McGowan v. Miss. State Oil & Gas Board, 604 So.2d 312, 323 (Miss.1992).
We certainly will accord a three to two vote the same deference as five-to-nothing. Still, the closeness of the vote goes to emphasize our need for understanding the reasons why the Commission ruled as it did, else how can we determine whether the Board acted arbitrarily or capriciously and/or whether substantial evidence undergirds its actions.
¶ 76. The supreme court was unable to ascertain why the Board acted as it did “[i]n the face of conflicting policy imperatives and (particularly on the environmental issues) conflicting testimony,” and remanded the case for specific findings of fact. Id.
¶ 77. In the instant case, there is no conflicting evidence regarding the facts establishing the occurrence of the violations. Here, Barrett Refining and M & S agree M & S assumed operations at the refinery from October 3, 1995 until January 30, 1996, pursuant to a verbal agreement.
¶ 78. Rather than merely “rubber-stamping” the MDEQ’s recommendation regarding the penalties, the Commission fully considered evidence presented by the parties and the post-hearing briefs before assessing $500,000 in penalties against M &S.
¶ 79. To ascertain whether the Commission acted arbitrarily or capriciously and/or whether substantial evidence un-dergirded its assessment of $500,000 in penalties against M & S, we begin with the maximum penalty which could have been imposed by the Commission. United States v. Marine Shale Processors, 81 F.3d 1329, 1337 (5th Cir.1996). Miss.Code Ann. § 49-17-43(a) (Rev.1995) mandates a civil penalty of not more than $25,000 for each violation of the Mississippi Air and Water Pollution Control Law, and “[e]ach day upon which a violation occurs shall be deemed a separate and additional violation.” Therefore, under § 49-17-43(a), *1123 the Commission had the discretion to penalize M & S in the amount of $25,000 for each day the violations occurred, or approximately $33,000,000. Obviously, the Commission chose not to impose the maximum penalty.
¶ 80. The prefiled testimony of MDEQ staff “adopted and accepted” by the Commission clearly set forth the bases for the Commission’s finding of liability for violations by M & S and detailed the method utilized by MDEQ in calculating the recommended penalties. This Court will address each violation found by the Commission, the facts substantiating the violation as set out in the prefiled testimony of MDEQ staff, and the penalty recommended by the MDEQ for each violation.

(a) Clean Air Act Violations

¶ 81. Elliott Bickerstaff testified regarding the basis for each of the Clean Air Act violations attributed to M & S. Bickerstaff also testified the recommended penalty for each violation was calculated in accordance with the EPA civil penalty policy without the MDEQ increasing any penalty for willfulness.
1.Violation of APC-S-2 Section I.B.l and NESHAPS General Provisions, 40 C.F.R. 61.05 and 61.07 for operating the facility without applying for and obtaining a construction permit for changes in operation that resulted in increased emissions subjecting the facility to NESHAP Subpart J— Equipment Leaks for Benzene.
¶ 82. The inspections performed on October 12, November 3, December 1, 13, and 27, 1995, and facility records indicated that the contents of facility storage Tanks 1 through 8 had been changed to lighter products of feed stocks and light end overhead products with higher vapor pressures than the permitted tank contents. An analysis of a sample taken by OSHA from Tanks 2 and 3 on October 5, 1995, found a benzene concentration of 16% and 39% respectively. EDL analyses showed benzene concentrations in samples from Tanks 1 and 3 of 31% and 40% respectively. No application or notification was submitted by Barrett Refining or M & S regarding this change in operations to process a product containing 35% to 40% benzene or any other non-crude oil stock. For this violation, MDEQ recommended that a penalty of $7,500 be assessed to M & S.
2. Violation of NSPS Subpart Ka, 40 C.F.R. 60.115a, and NSPS Subpart Kb, 40 C.F.R. 60.116b for failing to keep records of tank contents by these provisions for fourteen tanks (Tanks 1-11, A, B, and C).
¶ 83. During inspections on October 12, November 3, and December 1, 1995, only log sheets of tank levels with a generic description of the contents and no vapor pressures were presented in response to MDEQ requests for production of records. During inspections on December 13 and 27, 1995, in response to staff request for records, log sheets with some, but not all, of the tank liquid vapor pressures were presented to staff. Records were required to be maintained on each of the fourteen tanks on site. A penalty of $5,000 for each violation was recommended to be apportioned between Barrett Refining and M & S. For this violation, MDEQ recommended M & S be penalized the sum of $35,000.
3. Violation of NSPS Subpart Ka, 40 C.F.R. 60.112a(a)(2) for failing to properly operate and maintain the floating roofs for tanks 1, 2, 3, and 9 in accordance with these standards.
¶ 84. Tanks 1, 2, 3, and 9 contained contents having vapor pressures above 1.5 psia and, therefore, the internal floating roof on each tank was required to be floating at all times except during the initial fill and when the tank is completely emptied and subsequently refilled, and each opening in the floating roof is required to be equipped with a cover, seal, or lid that is closed at all times except when the device is in actual use. NSPS Subpart Ka, 40 C.F.R. § 60.112a(a)(2). An inspection on April 2, 1996, revealed that there were no *1124 covers on the openings in the floating roof on these tanks. In addition, at various times, including the inspection on December 13,1995, the floating roofs for Tanks 1, 2 and 9 were resting on their legs. The investigations resulted in four violations of failing to operate and maintain control equipment at $15,000 per violation for a recommended penalty of $60,000, with M & S assessed $30,000.
4. Violation of NSPS Subpart Kb, 40 C.F.R. 60.112b(a) for failing to properly equip and operate tank 10 with a vapor control device.
¶ 85. NSPS Subpart Kb, 40 C.F.R. § 60.112b(a) requires that a storage vessel containing a volatile organic liquid with a maximum true vapor pressure of 5.2 kPa (.75 psia) be equipped with a floating room or a vapor collection system. Based on information obtained during an inspection on December 27, 1995, Tank 10 contained a crude feed stock with a RVP of 1.3 psia. Tank 10 was a fixed roof storage tank. The recommended penalty for this violation was $15,000, with M & S to be charged $7,500.
5. Violation of NSPS Subpart Ka, 40 C.F.R. 60.113a(l) for failing to test tank 4 in accordance with this standard.
¶ 86. Tank 4, an external floating roof tank, was permitted for kerosene storage but was being used to store various feed stocks and overhead product cuts that had vapor pressures of greater than 1.5 psi which subjected it to NSPS Subpart Ka. Initial compliance testing was required pri- or to change in service from storage of a low vapor pressure material to a higher vapor pressure material. The recommended penalty for this failure to test was $15,000 to be apportioned between Barrett Refining and M & S. MDEQ recommended M & S be charged $7,500.
6. Violation of NESHAP Subpart A and V, 40 C.F.R. 61.09 and 247 for failing to submit notifications and reports required by these standards.
¶ 87. MDEQ received no notification of implementation or report of affected sources required under NESHAP Subpart A and V, 40 C.F.R. §§ 61.09 and 147. MDEQ recommended that one-half of the recommended penalty of $15,000 be charged to M & S.
7. Violation of NESHAP Subpart A and V, 40 C.F.R. 61.05(b), 13 and 245 for failing to perform testing required by these standards.
¶ 88. MDEQ received no notification or document indicating that the required testing under NESHAP Subpart A and V, 40 C.F.R. §§ 60.05(b), 13 and 245 had been performed. MDEQ recommended a penalty of $15,000 be charged to Barrett Refining and M & S. M & S’s portion would be $7,500 for this violation.
8. Violation of State of Mississippi Air Emission Operating Permit Requirements for the Purpose of Title V of the Federal Clean Air (APC-S-6) by failing to obtain a Title V Operating Permit by January 27,1996.
¶ 89. State Regulation APC-S-6, Air Emission Regulations for the Purposes of Title V of the Federal Clean Air Act required the refinery to obtain a Title V Operating Permit by January 27, 1996, unless a complete application was submitted prior to January 27, 1996. Barrett Refining submitted an application on January 29, 1996. The MDEQ found the application was not representative of the current operations at the facility and the application shield did not extend to operations not included in the application. The recommended penalty of $15,000 was charged against Barrett Refining and M & S.
¶ 90. Additionally, MDEQ recommended that M & S be assessed penalty gravity components as follows: NSPS violation, $2,500; HAP standard violation, $7,500; length of violation, $6,000; and size of violation, $1,000.

*1125
(b) Hazardous Waste Violations

¶ 91. The Commission incorporated the testimony of Richard Harrell, an environmental engineer in the Office of Pollution Control, Hazardous Waste Division, in its recitation of the hazardous waste violations:
1. Violation of Mississippi Hazardous Waste Management Regulations (MHWMR) 262.11 by generating a solid waste as defined in 40 C.F.R. Part 261.2 and failing to determine if that waste is a hazardous waste using an approved method. Samples gathered and analyzed by Environmental Diagnostic Laboratory on February 21-22, 1996 revealed that [M & S Petroleum, Inc.] was storing approximately 1.5 million gallons of benzene contaminated waste water in Tank 9. In addition, inspections by [DEQ] staff revealed that sludges in the oil/water separator and the heat exchanger bundle sludge on site (resulting from a fire) are a listed hazardous waste (K050).
The MDEQ-recommended penalty for this violation was $22,500, $11,250 to be charged to M & S.
2. [M & S Petroleum, Inc.] has stored the hazardous waste specified in item 1 for over 90 days without obtaining a permit which is a violation of 40 C.F.R. part 270.1(c) (MHWMR 270.1(c)).
¶ 92. Barrett Refining and M & S violated MHWMR 270.1(c) which provides that the Resource Conservation and Recovery Act (RCRA) requires a permit for the treatment, storage and disposal of any hazardous waste as identified or listed in 40 C.F.R. Part 261. Owners and operators of hazardous waste management units must have permits during the active life (including the closure period) of the unit. MHWMR 262.34(b) provides that a generator who accumulates hazardous waste for more than ninety days is an operator of a storage facility and is subject to the requirements of 40 C.F.R. Parts 264 and 265 and the permit requirements of 40 C.F.R. Part 270 unless he has been granted an extension of the ninety-day period. The record shows Barrett Refining and M & S stored hazardous waste significantly over the ninety-day period without obtaining a permit. As of January 17,1997, the MDEQ had not been notified that the generator(s) of the hazardous waste had disposed of the hazardous waste properly. The MDEQ recommended that Barrett Refining and M & S be fined $22,500 for failing to obtain a permit and $3000 a day for 180 plus days or $540,000 for storing a hazardous waste without a permit for more than ninety days. Thus, M & S’s portion of the recommended penalty for this violation would be $281,250.

(c) Clean Water Violations

¶ 93. The Commission found M & S violated the Clean Water Act in the following manner:
National Pollutant Discharge Elimination System (NPDES) Permit No. MS0035149 expired on August 27, 1995. [M & S Petroleum, Inc.] apparently discharged wastewater without a permit in violation of the Mississippi Air and Water Pollution Control Law Section 49-17-29 and Section 402 of the Federal Clean Water Act after August 27, 1995.
¶ 94. Wm. Stephen Spengler, Environmental Engineer III in the Office of Pollution Control, Surface Water Division, testified by affidavit that the refinery discharged wastewater and/or stormwater without an NPDES permit on two occasions in violation of Miss.Code Ann. § 49-17-29 and § 402 of the Clean Water Act. In support of this violation, Spengler referred to (1) discharge monitoring reports submitted by Barrett Refining for the months of October, November and December 1995, indicating that discharges were made; (2) notification by the City of Vicksburg that wastewater from the Barrett facility was observed and sampled from its outfall line on December 19, 1995; *1126 and correspondence from Barrett Refining’s attorney that the facility discharged stormwater on April 26, 27, 28 and 29 and on June 5 and 6, 1996. Jerry W. Cain, Environmental Engineer IV in the Office of Pollution Control, Surface Water Division, recommended M & S be assessed a penalty of $25,000 for discharging without an NPDES permit. Cain calculated the recommended penalty in accordance with the penalty guidance document for the Industrial Wastewater Control Branch. According to Cain, the refinery is considered a small source since it discharged less than 25,000 gallons of process wastewater per day. A penalty of $25,000 for each occasion or $50,000 was recommended to be apportioned between Barrett Refining and M & S.
¶ 95. MDEQ further recommended that the Commission consider the wilfulness of M & S’s actions, and the following costs incurred by MDEQ for restoration and abatement and the economic benefit M & S experienced by not operating in compliance with applicable permits, laws and regulations:
(i) Failure to obtain a RCRA Part B Permit, $25,000. According to Harrell, the historically assumed economic benefit for failure to obtain RCRA Part B permit is $50,000. MDEQ recommended that M & S be assessed $25,000.
(ii) Analysis performed by Environmental Diagnositic Laboratories, $24,865.50. A private contractor, EDL, was retained by MDEQ to determine the quantities of materials present at the facility and to analyze the materials when Barrett Refining and M & S failed to properly characterize and analyze waste for hazardous waste determination. This cost, $49,-730.98, is an economic benefit the facility gained by not performing the waste analy-ses. The MDEQ recommended M & S be assessed one-half of the total cost.
(in) Noncompliance with secondary containment, $33,269.50. The cost of secondary containment for Tank 9 which was used by the facility to store contaminated wastewater for over ninety days was calculated based on Means Heavy Construction Cost Data, 10th Annual Edition. Secondary containment meeting the requirements of 40 C.F.R. Parts 262.34(a)(1)(ii) and 265.193 were found necessary after sampling and analytical results performed by EDL showed that the wastewater was above the benzene level for TCLP RCRA hazardous waste as defined in 40 C.F.R. Part 261.
(iv) Air sampling performed by Haz-clean, $11,732. On October 3, 1995, MDEQ retained Hazclean to perform air monitoring along the perimeter of the refinery as a result of complaints of odor and benzene leaking from tanks. MDEQ recommended that the cost of the air monitoring by Hazclean be apportioned between Barrett Refining and M & S.
¶ 96. According to the prefiled testimony submitted by MDEQ, penalties totaling $539,367 against M & S were recommended by MDEQ ($127,000 for violations of the Clean Air Act; $292,500 for violations of the Mississippi Hazardous Waste Management Regulations; and $25,000 for violations of the Clean Water Act, and $94,867 for economic benefit and costs of restoration and abatement expended by MDEQ). Moreover, testimony at the full evidentiary hearing on April 27, 1996, showed that the MDEQ recommended dividing the penalties equally between Barrett Refining, as owner and permit holder, and M & S, as operator of the refinery, for any violations occurring at the refinery between October 3, 1995 and January 30, 1996.
¶ 97. Before determining the amount of penalties to assess, the Commission also considered the factors specified in Miss. Code Ann. §§ 17-17-29 and 49-17-43(g) (Rev.1995),[8] and found:
*1127 1. Willfulness of the Violation
M & S -willfully continued to operate the facility after being advised on numerous occasions that the facility was being operated in violation of the applicable laws and regulations. M & S exhibited a blatant, willful disregard of the permits, state and federal laws and regulations and the instructions it received from the MDEQ.
2. Any Damage to Air, Water, Land or Other Natural Resources of the State or their Uses
Currently, over 1.5 million gallons of hazardous wastewater is being stored in at least one of the tanks at the Facility which poses a threat for serious damage to natural resources in the event the contents of the tank are accidentally or intentionally released into the surface waters of the State or into groundwater through groundwater recovery wells at the facility is supported by the evidence presented. In addition, this tank of hazardous wastewater does not have adequate secondary containment. An assessment must be conducted at the Facility to determine the extent of contamination of the soil and groundwater at the Facility.
3. Costs of Restoration and Abatement
On October 3, 1995, the MDEQ retained Hazclean to perform air monitoring along the perimeter of the Facility as a result of odor complaints at a cost of $23,462. MDEQ retained Environmental Diagnostic Laboratories, Inc. to sample and analyze the contents of the tanks at the Facility on February 21-22, 1996 at a cost of $49,731.
4. Economic Benefit as a Result of Noncompliance
The Facility has experienced economic benefits by avoiding costs in not operating in compliance with its Air permit, NSPS, and NESHAPS. The facility has also avoided costs by failing to provide adequate wastewater treatment, failing to monitor the effluent, failing to maintain a discharge monitoring report system and failing to maintain an NPDES permit. The Facility experienced an economic benefit by failing to obtain a RCRA Part B Permit, failing to perform required sampling and analysis, and failing to have adequate secondary containment. The estimated amount of economic benefit of noncompliance was calculated by staff under the MDEQ’s pertinent penalty policies and, as included in staff testimony, is a basis of the penalties assessed in this matter.
5. The Seriousness of the Violation, including Any Harm to the Environment and Any Hazard to the Health, Safety and Welfare of the Public
The violations against the Facility are extremely serious due to the great potential for serious harm to the environment and to the health, safety and welfare of the public, as demonstrated in the testimony of MDEQ staff in this matter.
6. Past Performance History
MDEQ records reveal no past performance history of M & S with MDEQ; therefore, this factor did not positively or negatively affect the penalty calculation in this matter.
7. Whether the Noncompliance Was Discovered and Reported as the Result of a Voluntary Self-Evaluation
The violations were not reported by M & S as the result of a voluntary self-evaluation.
¶ 98. After considering the recommendations of the MDEQ staff, the statutory factors and the post-hearing briefs of the parties, the Commission, by a majority vote, assessed a total penalty against M & S in the amount of $500,000, which was $39,366 less than that recommended by MDEQ staff and substantially less than *1128 the maximum allowed by statute. Further, the penalty is in line with other penalties assessed by the Commission. For example, the MDEQ settled an enforcement matter through an agreed order pri- or to a hearing before the Commission for $1,650,000 involving a violation of a major environmental law and the treatment, storage or disposal of hazardous waste. Had the matter proceeded to hearing the MDEQ would have recommended a greater penalty. The case now before the Court involves multiple violations of three major environmental laws: the Clean Air Act, the Clean Water Act, and the Resource Conservation and Recovery Act.
¶ 99. We find the penalty assessed to be reasonable in light of the well-documented violations occurring at the refinery while the refinery was operated by M & S, the refusal of M & S to comply with the instructions of MDEQ staff, and the denial of M & S regarding its responsibility to ensure the refinery was operated in a manner consistent with the federal and state environmental law, rules and regulations. This assignment is without merit.
III. WHETHER THE PENALTIES ASSESSED BY THE COMMISSION ARE DISPROPORTIONATELY HIGH AND CONSTITUTE A DENIAL OF DUE PROCESS AND EQUAL PROTECTION.
¶ 100. M & S argues the Commission’s assessment of a “record-breaking” fine against M & S when there was no damage to the air, water, land or other natural resources constitutes a denial of due process and equal protection. We find this argument without merit. No evidence of actual harm to the environment by M & S need be established by the MDEQ. Chevron v. Yost, 919 F.2d 27, 29 (5th Cir.1990) (civil penalties may be imposed even if violation did not cause actual injury to environment). Nevertheless, the evidence presented showed that while the Barrett Refinery was operating under the direction of M & S numerous complaints of odors emanating from the facility were reported by the public, analyses of samples taken from tanks at the refinery revealed excessive benzene concentrations, inspections revealed leaking tanks, spillage, and improperly stored hazardous wastes. Further, M & S was provided due process by the Commission through the full evidentia-ry hearing and submission of post-hearing briefs.
CONCLUSION
¶ 101. We find the Commission’s order holding M & S liable for operating the Barrett Refinery from October 3, 1995 to at least January 30, 1996, in violation of the Clean Air Act, the Mississippi Hazardous Wastes Management and the Clean Water Act and the rules and regulations thereto and assessing penalties against M & S in the amount of $500,000 for such violations was supported by sufficient evidence, was neither arbitrary nor capricious, nor in violation of M & S’s due process and equal protection rights. Therefore, we affirm the order of the Mississippi Commission on Environmental Quality requiring M & S Petroleum, Inc. (1) to comply with the terms and conditions of Ex Parte Order No. 3226-96, as modified to allow on-site treatment of the wastewater if such treatment is conducted in accordance with all applicable federal and state laws and regulations and with the prior approval of the Mississippi Department of Environmental Quality (MDEQ); (2) to retain an environmental consultant to perform a site remedial investigation in order to determine the extent of contamination of soil and groundwater at the Barrett Refinery in Vicksburg; (3) to perform site remediation for any media contamination that violates any state or federal standards, regulations, and/or laws, state clean-up standards or state or federal applicable or relevant and appropriate requirements; and (4) to pay penalties totaling $500,000, $250,000 of which is to be held in abeyance pending the *1129 completion of the requirements of the Commission’s order.
¶ 102. We admonish the Commission to set out the necessary findings of fact on the ultimate issues in its future orders, clearly indicating the Commission’s reasoning, and giving evidence to support its conclusions rather than merely “adopting and accepting” MDEQ testimony, especially when assessing large penalties. By enumerating the bases for the amount of the penalty assessed against a violator, interested persons will be informed of the penalty which may be reasonably expected for an infraction under similar facts.
¶ 103. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY AFFIRMING THE ORDER OF THE MISSISSIPPI COMMISSION OF ENVIRONMENTAL QUALITY IS AFFIRMED. COSTS ARE ASSESSED TO THE APPELLANT, M & S PETROLEUM, INC..
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.
MOORE, J., NOT PARTICIPATING.

. According to Mullins, the forms signed by operators and mechanics indicating that the employees had received and read the operating and safety procedures for the safe handling of hazardous material were stolen.

. No date was noted on the laboratory analysis report as to when the sample was pulled by M & S. The report was dated October 24, 1995.

. Because the appeal as to Barrett Refining has been dismissed, we do not address the specific contents of Ex Parte Order No. 3227-96.

. During discussion of the motion, Commissioner Laird expressed his opinion that the parties should be fined a flat sum, not have the fine contingent upon remediation or testing. The votes at the May 22 hearing were:
Henry S. Weiss, Chairman — Aye
Dick Flowers — Aye
Thomas L. Goldman — Aye
Henry F. Laird, Jr. — Nay
Commissioners Gale Singley and Bob Hut-son asked they be shown as abstaining.

. Commissioner Goldman explained the penalty during discussion:
In other words, Barrett can get a maximum of 250,000 credit against the total $750,000 by spending the money on testing and remediation at the site as approved by the staff. If Barrett completes remediation of the site, [it] doesn't owe any of the 250,000, even if its shares of the complete testing and remediation doesn't reach 250,000.

. M & S describes itself as a subcontractor of Barrett Refining Corporation. The Mississippi Supreme Court has defined the term subcontractor as "one who enters into a contract, express or implied, for the performance of an act with a person who has already contracted for its performance, or who takes a portion of a contract from the principal or prime contractor.” Amoco Production Co. v. Murphy, 528 So.2d 1123 (Miss.1988). Here, Barrett Refining Corporation entered into a contract with M & S whereby Barrett’s employees would process materials owned by M & S at Barrett's facility in Vicksburg into a finished product. M & S would sell the finished product to a third party. When Barrett Refining's employees walked off the job, M & S assumed plant operations with M & S employees through an oral agreement with Barrett. The only parties involved in the contractual relationship were Barrett Refining and M & S. Thus, we do not find persuasive M & S's argument that it was a subcontractor of Barrett Refining.

. Miss.Code Ann. § 49-17-43(g) (Rev. 1995) provides:
In determining the amount of any penalty under this chapter, the commission shall consider at a minimum:
(i) The willfulness of the violation;
(ii) Any damage to air, water, land or other natural resources of the state or their uses;
(iii) Costs of restoration and abatement;
(iv) Economic benefit as a result of noncompliance;
(v) The seriousness of the violation, including any harm to the environment and any hazard to the health, safety and welfare of the public;
(vi) Past performance history; and
(vii) Whether the noncompliance was discovered and reported as the result of a voluntary self-evaluation. If a person discovers as a result of a voluntary self-evaluation, information related to noncompliance with an environmental law and voluntarily discloses that information to the department, commission or any employee thereof, the commission shall, to the greatest extent possible, reduce a penalty, if any, determined by the commission, except for economic benefit as a result of noncompliance, to a de minimis amount if all of the following are true:
1. The disclosure is made promptly after knowledge of the information disclosed is obtained by the person;
2. The person making the disclosure initiates the appropriate corrective actions and pursues those corrective actions with due diligence;
3. The person making the disclosure cooperates with the commission and the department regarding investigation of the issues identified in the disclosure;
*1122 4. The person is not otherwise required by an environmental law to make the disclosure to the commission or the department;
5. The information was not obtained through any source independent of the voluntary self-evaluation or by the department through observation, sampling or monitoring; and
6.The noncompliance did not result in a substantial endangerment threatening the public health, safety or welfare or the environment.

. Sections 17-17-29(7) and 49-17-43(g) are identical in that both sections set forth factors to be considered by the Commission before determining the amount of penalty to impose *1127 when the Solid Wastes Disposal Law or the Mississippi Air and Water Pollution Control Law, respectively, is violated.